With respect to the 101 issue, I'd like to start by very briefly talking about the background of this invention, because I think it's important context for the 101 inquiry. Obviously, as the panel is well aware, health care costs are an issue in the country, and one of the ways to attempt to address those costs is through physician efficiency measurement, which is a way of determining how efficiently doctors care for their patients relative to their peers. During the period of time when the patent application was filed, Dr. Cave had a Ph.D. in the relevant field, and he was charged with evaluating the various methodologies that existed at the time to counsel clients on which ones to license and use. He had exposure to a lot of flaws in those methodological approaches. I've got to stop you. I don't think that what's at issue is whether or not he potentially invented something useful. I think what's at issue is are these claims eligible in light of the enormous amount of precedent, including electric power, which I'm having trouble distinguishing these claims from. This isn't a matter of do I think that the inventor of this technology contributed something useful to society. It's a matter of whether these kinds of claims are eligible regardless of whether they're useful to society. So skip all the other stuff and just go to that. Got it. So I think then really we're fast-forwarding to step one and step two specifically, and I suspect your interest in talking about step one is probably not very heavy, but I would like to make one point with respect to step one. McRow, we believe, is a direct analog for this case. McRow is a step one case where the court determined that because the claims were directed to a specific set of rules, a specific implementation, that the claims were therefore not directed to an abstract idea. We have to reconcile McRow with electric power group and then SAP and many, many other cases. Yes. And so it seems like the most reasonable way to reconcile all of those cases is to say McRow was about improving a technological process in the sense that you now were able to synchronize the animated characters on a display with all of the sound coming in. And so what you did was you improved some technical process. Now we look back at cases like electric power group or SAP and then several others, and then we say, well, ultimately the invention wasn't directed to an improvement of some technological process or the functionality of a computer in any of those cases because in the end they were just about collecting data and then analyzing that data and then displaying the result of that analysis. And so if that's the way to understand all of our case law, why doesn't your claims here, which is about collecting data from medical claims and then analyzing it to try to figure out how to score the relative efficiency of a doctor, as being something more akin to the line of cases in things like electric power group, SAP, et cetera, et cetera, et cetera? A couple of points. One, I think it's a dangerous road to travel down to think that merely analyzing data, developing algorithms and applying those algorithms in specific technical ways isn't patentable because at core a computer takes in data and produces other data. So if that is the premise we're working from, essentially nothing that doesn't specifically improve technical hardware, computer hardware, will ever be patentable. And that's not what the Federal Circuit's jurisprudence suggests. Instead, and I understand the issue you're grappling with. So what's the takeaway from electric power group, which was about collecting data from sensors all over a very large, complex electrical power grid and then using all kinds of data analytics to produce, essentially, a score on the relative health and risk of a breakdown of any particular sector of electrical power grid? So I think electrical power system suffers from maybe two ills. First, electrical power systems dealt with... Can we call it electric power group? I think that's what it's called. I'm sorry. My apologies. Yeah, it's okay. Electrical power group deals with aggregating data from disparate areas and presenting it to a user in one consolidated place, essentially. And that abstract idea, the notion of taking disparate sets of data and presenting them together, is essentially what the claims were directed to. The claims were directed to that exact approach. I understand that there was a data analysis component of the claim, too, and the court recognized that and grappled with it and then ultimately said the types of analysis that are being engaged in the claim are essentially equivalent to perhaps the kinds of processes one would go through in their minds in terms of crunching down data to produce a score on the relative health of an electrical power grid. And so that itself was within the realm of abstract ideas. I think there are two issues rolled up in what you've just articulated. One of them is that the scope of the claim is commensurate with the abstract idea to which the claims are directed. And number two is that the ideas that are represented in the claims are all conventional and well-known. There was no indication in the electrical power system, electrical power group case, that there were new inventive concepts there, non-well-known concepts. And I think that is a very important distinction between that case, and many of the others you've articulated, SAP included, and our case. The reason I believe our case is like McGraw is that, and I'll say I think even our case is a more extreme example of compatibility than McGraw, because McGraw was taking what was done by a human and started automating it on a computer. Because the record in McGraw is that prior to this computerized system, humans had to go in and key all the information in. So McGraw dealt with automating that process. And it was new. That was a new process that was not conventional and well-known. And that's why it was determined to be patentable. Just like that in CC group. What am I missing from your claims, which is taking existing data from medical claims and then grouping them and applying some metrics to find out the score of a doctor? There are a number. Am I missing something about that claim? I think, respectfully, you may be looking at it at too high a level. Because to me, it's like if I was an office manager and I had 100 employees, and they were all doing the same work. And they're all working under a particular performance plan, which is designed to motivate them to be as efficient as possible. And then I design a new performance plan. And I discover that my new performance plan, with all these different factors, in terms of how they performed on specific projects that they have and how they do on teamwork and all these other items, leadership and all these other great things, I've cracked the code and figured out exactly how to best motivate all these employees. And so what I've done is created a performance plan that creates a higher-performing office overall. Would I be entitled to a patent on that? Well, I think the danger in that approach is that we're not looking through the prism of the skilled artisan. And I think it's easy to say, oh, gosh, this seems simple and straightforward. But the whole purpose of the Berkheimer case was to say- I guess I'm still stuck on my question, which is would I be entitled, would I be eligible for a patent on my new performance plan? My answer is it would depend on whether the performance plan that you developed and implemented involved non-conventional and non-well-known approaches. If it did, then there's no reason you shouldn't be entitled to obtain a patent on that because you have developed something new, not just from a novelty perspective, but the whole point of 101 is to avoid allowing someone to capture these abstract ideas, the fundamental building blocks. And if you've come up with something new that bucks a trend in the industry and in the scope of the skilled artisan really did change something, developed something new and devoted to the art, then as long as you're not encompassing that entire abstract idea, you should be entitled to get a patent on your specific implementation of that new idea. My invention doesn't improve a computer in any way or any kind of technological process. I mean, even if I had a computer running, right, oh, I have all these different factors and this one's worth 5%, this one's worth 10% of the overall score, and this one factor, I'm going to combine it with this other factor and put some coefficient next to it and divide it by 4, and then I'm going to have a number for that particular factor, and then I'm just going to have a computer running all of that. But that couldn't be said to be improving the computer or improving some technological process, would it? I don't know enough about that fact pattern to say whether it would be a technological process or not. I would say that in this case, C.C. Group's invention does improve a technological process because it improves methodologies by which you develop physician efficiency scores. There's an industry built around evaluating physician efficiency and how you do it, and he has claims. He teaches these fundamental problems, articulates 10 of them, and then based on his experience has developed solutions to those problems, and the claims that he has obtained track those specific solutions with a particular process for addressing those problems to achieve those solutions, and that is all in the context of a technological approach because he is developing physician efficiency score in this industry for physician efficiency scoring, and it's not as simple as saying Steve's doing a better job than Joe is on filling out spreadsheets. It's very complex, and that's why looking through the prism of the skilled artisan is important here. Respectfully, I don't think it's appropriate for anyone here, because we're not skilled artisans, to say whether or not the process, the specific process, and it is very specific in the claims, the specific process is conventional and well known. It's easy to abstract that out, to step away from it and say, oh, it's just analyzing data, but that's not giving credence to the significant amount of work and the complexity that goes into this industry, and I think that's the real risk, and I think that's also what distinguishes us and McRow from other cases like electrical power and SAP, because in McRow and in CC Group, we're dealing with an actual innovation. We're dealing with something that was not conventional and well known. Elements within that process are not conventional and well known, and although I recognize there's a question about whether the Truven record is even applicable here, but in the Truven case, both experts agreed no one had done this before. It was not conventional and well known. It had not even been publicized, so we're dealing with something that's very new, that is not conventional and well known, and improves the technological process, because we're dealing with a highly technical field involving physician efficiency scoring. I know I'm well into my rebuttal time. Okay. Why don't you save the rest, Mr. Chassman? Good morning, Your Honors. May it please the court, Pete Chassman on behalf of Appley HCSC Corporation. Obviously, we're here today to ask the court to affirm the district court's dismissal of CAVE or CC Group's complaint on Section 101 grounds. We believe the district court's conclusion was correct. The claims in this case, claims 13 and 20 of the 981 patent, were directed to an abstract concept, that of determining physician efficiency. That is, how efficiently did a person or employee do his or her job? As the court has already noted, the claims here fall into a class of claims with which the court is already very familiar, claims directed to data collection, processing, and generating an output or a result. Those types of claims are not directed to technology. This court has repeatedly held that claims of this type don't pass ALICE Step 1. Claims here suffer from an additional problem, and that is that they're written in very functional and result-oriented language that makes them even more abstract. Finally, it was entirely proper for the district court to dismiss the complaint at the pleading stage. Are you saying that if CAVE Consulting claimed a method of scoring doctors that engaged in 400 steps, you know, really detailing the operations the processor is going to engage in to ultimately arrive at the final score, Step 400, then that would be patent eligible? What I'm saying is, in this case, really we had two issues. One is that the claims were written in result-oriented language, and I'm happy to take the court to that, and I plan to. I'm giving you a hypothetical right now. Okay, you're saying... A 400-step claim for scoring a doctor. Well, I mean, under ALICE, the claims need to contribute to some form of technology, especially in the context of a patent claim directed to a computer. Is there an improvement in computer technology or other technology? To me, there seems to be a division in the cases, and patents that are not directed to an advancement in computer technology or some other form of technology don't seem to pass muster under ALICE. Well, Judge Shen's 400-step example might come a little closer to McGrow than this case because McGrow also focused on the specificity of what was being claimed, and one of your arguments distinguishing McGrow, as I understand it, is the broad functional claiming at issue in this case, right? So I'm not suggesting that if there were 400 steps, it would necessarily just be like McGrow, but it would be more specific the way McGrow was more specific. Possibly, possibly, Your Honor. It would depend on how the steps are worded, and I think another difference between McGrow and this case is McGrow was in a technical field, computer animation, synchronization of voice and video. So I think that's another distinction. In any event, here— Our case law is a little confusing, is it not, in that everything that requires a computer to engage in a series of operations can be said to be in a technical field. And so now what we have created is a world where we divide those types of inventions into two buckets, one in which we say, well, all those operations are ultimately for improving some technical function, maybe being able to store data more efficiently or compressing data more efficiently, versus another kind of set of operations, which are maybe the kinds that are happening here, trying to figure out whether one doctor is more valuable than another, or maybe whether there's a problem with an electrical power grid, or maybe trying to predict when there's going to be an earthquake. I mean, all of those, we've got a computer doing a series of computations, just like there's a series of computations going on in the data compression and data storage conventions, but we seem to be saying one set is patent-eligible and the other is not patent-eligible. Do you see the confusion there? I understand your point, Your Honor. It's true that computers are used in all of those examples. The cases do seem to make a division, and the Alice case seems to make a decision from the Supreme Court that we're drawing a line as to what we're going to call technology. If we're looking at efficiency in electric power, if we're evaluating whether there's risk in a financial transaction, things like that tend to fall in the bucket of being abstract. It's an abstract concept here. What about a claim, a method claim, for diagnosing when is there going to be an earthquake? What if some Caltech scientists... MIT, go ahead. Caltech scientists. They couldn't possibly come up with it, but all right, it's a high five. UCLA scientists. How about a team of three scientists? We have all of the colleges covered. A team of Ph.D. students figured out how to take existing data of measuring what's going on underground, and they've come up with some really complex math algorithms, and now they can figure out there's going to be an earthquake, at least an 8.0 earthquake where the epicenter is going to be right under Barstow in eight days. That's a pretty valuable thing to figure out. Do you think that would be eligible for patent protection? I'd sure hold it eligible. Well, let's not prejudge. First of all, of course, we'd have to see how the claims were worded, but... Using a lot of data analytics metrics, taking the data, analyzing that data, and coming up with basically a prediction score. I think under the existing case law, that may be useful. It may be novel, but I'm not so sure that it would be patent eligible. It's two different things. Actually, I think that CABE confuses those two things here. They say, well, what we did here was unconventional. I want Judge Chen's hypo as a case, so go find it, because maybe the Supreme Court would actually rule that something was eligible, and we'd have a bookend. Well, that may be. I understand the difficulty in resolving an issue like this. I mean, yes, computers are involved in all of these things, but in going back and reading the cases, there does seem to be a division that's right from the Supreme Court, that there's a line being drawn between what the court considers technology and just merely data processing. Would it be fair to suggest that really all of that comes down to what the Supreme Court hasn't expressly said it this way, but I kind of understand it this way in my own thinking. If the thing that's really novel, if the thing you really invented is the abstract part, you can't get a patent on it. And so in Judge Chen's example, the abstract part would be the particular algorithm for analyzing the data that allows you to accurately predict earthquakes. That's really not much different than a formula, and if any general purpose computer could do this, that's not eligible. I think that's consistent with the cases that we've seen. When you look at the claim in this case. It's not satisfying, but it's nonetheless the law. You can count on the good graces of those Caltech scientists to keep moving forward regardless. Well, hopefully. The inducement of a possible reward under the patent system. I hope they're working on it. But Cave's argument here really confuses novelty with unconventionality. The things that they say were the breakthrough in what they claim are that they select particular data for these episodes of care. They say they select it in a way that was different from what had been done before. And they say that... But that's not in Claim 13. Pardon? But that's not really in Claim 13. The particularized data that they're selecting. Well, what they say is that the way they apply this maximum duration rule somehow incorporates it, I guess. They also say that, well, instead of calculating these statistics on episodes of care for all treatments, all medical conditions, they only pick certain ones. But the case law tells us that just selecting particular data doesn't take a patent claim out of the abstract. It may or may not have been novel. I mean, we'll dispute its novelty. Their argument really is that it's novel. That doesn't make it unconventional. And that's really what I think they say their claim boils down to. Well, but if it is novel, couldn't that help them under the second step? It might help somewhat. But I don't think the test for 101 and 102 are exactly the same. And really what they are doing here are things that all really had been done before. They just say, well, we'll select the data a little bit differently. Patent admits in the past medical claims data was grouped into episodes of care. And then it's a unit of measure of how much service was provided to treat a particular condition. And then we're going to use a computer to use the episodes of care for doctors to figure out how efficient the person was. I mean, that's all history when this patent came along. So they say, well, you know, we picked the data a little bit differently, and it refines our results. It makes our results more accurate. But that doesn't take it out of the abstract. Yeah, but even claims directed to an abstract idea can survive Alice under step two. They could, but I don't think that they should in this case. I mean, when you look at the claims, and I'm looking specifically at claim 13 right now, appendix page 157, column 2, starting at line 58, we have a method implemented on a computer system of determining physician efficiency. And I'm not going to read the whole claim to you, but I do want to hit a few of the elements to make a point. First step, obtaining medical claims data stored in a computer-readable medium. Then performing patient analysis using said obtained medical claims data to form episodes of care. It doesn't tell us how to form the episodes of care. Performing output process based on performed patient analysis utilizing the computer system. Sub-step, assigning episodes of care to physicians. Doesn't tell us how. That's a result. Assigning at least one physician to a report group utilizing the computer system. That's a result. That doesn't tell us how. Same for determining eligible physicians and episode of care assignments utilizing the computer system. Yeah, but I feel like going back to Judge Shen's earlier question, even if these claims told us how to do it, you'd still be telling me they're ineligible. I probably would, but I think this is a separate basis for why they also are ineligible. Under step two. I mean, when you get to the final step, it's determining efficiency scores for physicians from basically two pieces of data. It doesn't tell you how to do it. It just tells you that it needs to be done. Finally, CAVE argues somehow that the allegations in its complaint and its expert declaration preclude dismissal. We don't think that they do. As a general matter, it's completely appropriate for court to grant a motion to dismiss on 101 grounds. Really, the issue here is whether the claims themselves satisfy 101. And there's nothing about the complaint or the expert declaration that can change that. They can change two things about the claims. One is that they're directed to this abstract concept of determining someone's efficiency in doing his or her job. And so they fall into this category of claims directed to data collection, processing, and output, where the computer is just a tool. The computer is not part of the innovation. The other thing is that the claims are written in this functional, result-oriented language that I just reviewed with you. And that doesn't transform the claims into patentable subject matter. In fact, I'd say it makes them even more abstract. So here the court made a determination that the claims didn't satisfy Section 101. As a matter of law, by looking at the patent alone, and that's what we ask this court to do, is to affirm the decision of the district court on the basis of the patent itself. When you were reading all those claim limitations that you were telling me that were just functional and didn't tell you how to do it, you never mentioned the two that they most strongly advocate about, which is the static window periods or the predefined set of medical conditions. So what about those? You picked the elements of the claim that were the most general for you and ignored entirely the ones they spent the most pages arguing about. Well, there is case law that says that even having certain novel elements doesn't save a claim from being abstract. In other words, a novel abstract idea is still an abstract idea? It is. It is.  In fact, the presence of a couple of elements, even if new, doesn't transform the claim. Why not? How do you understand Step 2 of ALICE? I understand Step 2 as requiring us to take a look at the elements alone and in combination to see if it transforms us from the abstract to something that's not abstract. So much of this claim is abstract. But as I understand the language, it's whether they recite something more than well-understood, routinely conventional activities. So the fact that you say most of the claim is abstract or most of the claim is conventional doesn't refute whether it discloses something more. Electric power tells us, merely selecting information by content or source for collection, analysis, and display does not transform an abstract idea into a patent-eligible invention. And I think that's what those elements are. Ultramercial tells us that even if some steps weren't known in the art previously, that's not enough for eligibility. Ultramercial versus Hulu, 772, Fed Third at 716. I think those two principles answer your questions. I guess the idea is if the alleged unconventionality lies in the realm of abstract ideas, then that's not the kind of unconventionality that can establish an inventive concept under Step 2 of Alice. And that's electric power group, SAD, BSG, etc. I'd say that's analogous, yes. Okay, well, let's hear from opposing counsel. We've got a little bit of rebuttal time left. Thank you, Your Honors. Thank you. Thank you. I'd like to start by addressing the claim language, and I take issue with the representation that it's functional. These claims are very specific regarding the steps that are performed. You take in medical claims data. You use an episode-of-care-based methodology. You develop episodes of care using a maximum duration rule. You develop those episodes of care using a specific static window period maximum duration rule for building those episodes of care. You then assign physicians to a report group, so generating report groups to compare physicians. You then calculate statistics for individual medical conditions, broken arms, broken legs, broken collarbones. You then calculate statistics across medical conditions specifically. So you come up with aggregate efficiency information about a particular physician. And you do all of this using predefined sets of medical conditions per specialty type. These are not functional. These are specific process claims that are distinguishable from other processes for calculating physician efficiency. So it's wrong to say this is functional. There are very specific steps here. And those steps, by the way, align directly with what the specification teaches needs to be improved in the art. Two, electrical power. It says two things that I think are very relevant here. One of them, they distinguish electrical power from other cases, saying the claims in this case do not even require a new source or type of information, something we have here, or new techniques for analyzing it, something we have here. That case goes on to say, as a result, the claims do not require an arguably inventive set of components or methods, which we do articulate here, such as measurement devices or techniques that would generate new data. We have that here also. So we are distinguishable from electrical power because the very problem with it I'm sorry. I'm sorry. I'm trying to rush. I apologize. Electric power group is different because it didn't teach something more. Everything was conventional. Here, there is more. It's wrong for us non-skilled artisans to assess that. That's why Berkheimer says we need to go look at the facts and determine whether skilled artisans believe there's something more than the mere abstract idea. If we look, the only way this approach has any legitimacy is if we maintain the same abstract idea for step one and step two. The abstract idea articulated by the court is a method for determining physician efficiency by obtaining medical claim data, analyzing the data, assigning the data, and calculating statistics. The specific steps in these claims is far beyond what the abstract idea is that's articulated there. It is significantly more. The question under Berkheimer then is whether that's conventional and well-known. There is no evidence in this case, especially not the Rule 12 phase, that establishes that they are all conventional and well-known. In fact, our pleadings are full of evidence that this is not conventional and well-known. What about in a case like SAP where the purported improvement in analyzing and forecasting investments with some new kind of data analysis, some kind of new math, and that claim went down, and we said, well, all of your purported new data analysis is an improvement in wholly abstract ideas. And so, therefore, that's not an inventive concept. Even if we accept for purposes of this appeal that there's something unconventional about your data analysis. The question is whether that something nonconventional is materially more than the abstract idea itself. And if we look at the district court's articulation of the abstract idea, it is inescapable that the claim limitations articulate something more. And then we have to determine whether, from a factual perspective, that's nonconventional. The other thing about SAP is that dealt with known methods, Gaussian and non-Gaussian approaches. Those are all known things. CC groups dealing with something new, something nonconventional. That's the distinction. I think the last thing I'll say, you raised a public policy question. I think it's a very serious question because the ultimate outcome of these kinds of one-on-one cases, if we're going to deny patentability for these important innovations, is people are going to keep them as trade secrets. And that's exactly opposite the entire purpose of the patent law. So we need to find a mechanism, a way to encourage inventors to obtain protection to share their inventions with the public. Okay. I thank all counsel in both cases. I think the arguments were well presented and helpful to the court. So thank you very much. Thank you both. This has taken their submission.